Cristina Perez Hesano (#027023)
**PEREZ LAW GROUP, PLLC**
7508 N. 59th Avenue
Glendale, Arizona 85301
Phone: (602) 730-7100
Fax: (602) 794-6956
cperez@perezlawgroup.com

*Counsel for Plaintiff and the Putative Class*

[Additional Counsel listed on Signature Block]

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| **Karin Dossett**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>**VirMedice, L.L.C.**,<br><br>Defendant. | Case No.: ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Karin Dossett ("Plaintiff"), individually and on behalf of the Class defined below of similarly situated persons, allege the following against Defendant VirMedice, L.L.C. ("Defendant"), based upon personal knowledge with respect to herself, and on information and belief derived from, among other things, investigation by counsel as to all other matters:

## SUMMARY OF THE CASE

1. This action arises from Defendant's failure to secure the personal identifiable

information ("PII")[1] and protected health information ("PHI")[2] (collectively, "Private Information") of Plaintiff and the members of the proposed Class, that was compromised in a cyber incident (the "Data Breach" or "Breach").

2. Defendant is a healthcare technology company that provides practice management and electronic health record solutions and medical data management services to various medical practices and practitioners ("Defendant's Clients" or "Clients").[3]

3. In the regular course of its for-profit business, Defendant collects patient information from its Clients and is fully aware of the sensitivity of the information that it collects and its obligation to maintain that information as confidential and safe from unauthorized access.

4. Upon information and belief, on or around September 11, 2025, Defendant experienced a Data Breach.[4] Shortly thereafter, on or around September 15, 2025, the ransomware group "Pear" began appearing online as the third-party responsible for the Data

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited Nov. 17, 2025).

[3] http://virmedice.com/ (last visited Nov. 17, 2025).

[4] https://www.hookphish.com/blog/ransomware-group-pear-hits-virmedice/ (last visited Nov. 17, 2025).

Breach.[5]

5. Pear is a cybercriminal group that focuses on data exfiltration and extortion rather than encrypting a victim's systems, primarily targeting sensitive information to leverage for ransom payments.[6]

6. Upon information and the investigation of counsel, the Data Breach resulted in the unauthorized access and exfiltration of files containing Private Information of Defendant's Clients patients, including Plaintiff and Class Members.

7. Upon information and the investigation of counsel, the following types of Private Information were compromised as a result of the Data Breach: name, Social Security number, address, and medical information.

8. To date, Defendant has yet to issue any public disclosure about the Data Breach.

9. Defendant could have prevented this Data Breach by implementing reasonable, expected, and industry standard data security measures. Instead, Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement these measures to safeguard its Clients patients' Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendant's woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of its negligence.

10. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have suffered actual and present injuries, including but not limited to: (a) present, certainly

---

[5] https://www.ransomfeed.it/index.php?page=post_details&id_post=25668 (last visited Nov. 17, 2025).

[6] https://www.ransomware.live/group/pear (last visited Nov. 17, 2025).

impending, and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Private Information; (b) diminution of value of their Private Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Private Information; (e) mitigation expenses and time spent responding to and remedying the effects of the Data Breach; (f) "out of pocket" costs incurred due to actual identity theft; (g) decreased credit scores; (h) anxiety, annoyance, and nuisance; and (i) continued risk to their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members' Private Information.

11. Plaintiff and Class Members would not have provided their valuable Private Information had they known that Defendant would, *inter alia*, make their Private Information Internet-accessible, not encrypt personal and sensitive data elements and not delete the Private Information it no longer had reason to maintain.

12. Through this lawsuit, Plaintiff seeks to hold Defendant responsible for the injuries it inflicted on Plaintiff and Class Members due to its impermissibly inadequate data security measures and seeks injunctive relief to ensure the implementation of proper security measures to protect the Private Information that remains in Defendant's possession.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship,

including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

14. This Court has personal jurisdiction over Defendant because it is an Arizona limited liability company that operates and has its principal place of business in this District and conducts substantial business in this District.

15. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is domiciled in this District, maintains Plaintiff and Class Members' Private Information in this District, and has caused harm to Plaintiff and Class Members in this District.

## PARTIES

16. Plaintiff Karin Dossett is a resident and citizen of Whitesburg, Tennessee.

17. Defendant is an Arizona limited liability company with its headquarters and principal place of business located at 706 E Bell Rd, Suite 204, Phoenix, Arizona, 85022. Defendant's statutory agent is Wayne A. Smith located at 3300 N. Central Ave, Suite 1800, Phoenix, Arizona, 85012.

## FACTUAL ALLEGATIONS

### A. Background on Defendant

18. Defendant is a healthcare technology company that provides practice management and electronic health record solutions and medical data management services to its Clients.

19. As a condition of doing business, Defendant requires that Clients entrust it with highly sensitive personal information belonging to their patients. In the ordinary course of

receiving service from Defendant's Clients, Plaintiff and Class Members were required to provide their Private Information to Defendant, either directly or indirectly.

20. Upon information and belief, Defendant made promises and representations to individuals', including Plaintiff and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

21. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

22. As a result of collecting and storing the Private Information of Plaintiff and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiff and the Class Members' Private Information from disclosure to third parties.

**B. The Data Breach**

23. Upon information and belief, on or around September 11, 2025, Defendant experienced a Data Breach.[7] Shortly thereafter, on or around September 15, 2025, the ransomware group Pear began appearing online as the third-party responsible for the Data Breach.[8]

24. Upon information and the investigation of counsel, the Data Breach resulted in

[7] https://www.hookphish.com/blog/ransomware-group-pear-hits-virmedice/ (last visited Nov. 17, 2025).

[8] https://www.ransomfeed.it/index.php?page=post_details&id_post=25668 (last visited Nov. 17, 2025).

the unauthorized access and exfiltration of files containing Private Information of Defendant's Clients patients, including Plaintiff and Class Members.

25. Upon information and the investigation of counsel, the following types of Private Information were compromised as a result of the Data Breach: name, Social Security number, address, and medical information.

26. To date, Defendant has yet to issue any public disclosure about the Data Breach.

27. Defendant had obligations created by the Federal Trade Commission Act ("FTCA"), the Health Insurance Portability and Accountability Act ("HIPAA"), contract, common law, and industry standards to keep Plaintiff and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure

28. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

29. The Data Breach resulted in unauthorized third-party accessing and acquiring files containing unencrypted Private Information of Plaintiff and Class Members. Plaintiff and Class Members' Private Information was accessed and stolen in the Data Breach.

30. Upon information and belief, Plaintiff's Private Information, and that of Class Members, was subsequently published on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

31. Defendant failed to take precautions designed to keep individuals' Private Information secure.

32. Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

**C. Data Breaches are Foreseeable and Preventable**

33. Data breaches are preventable.[9] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[10] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[11]

34. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. Data breaches have been on the rise for several years. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

35. In light of recent high profile data breaches at other industry leading companies,

---

[9] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

[10] *Id.* at 17.

[11] *Id.* at 28.

including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

36. Additionally, as companies became more dependent on computer systems to run their business,[12] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[13]

37. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

38. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to, upon information and belief, thousands of individuals detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

**D. Defendant Failed to Comply with Regulatory Requirements and Standards.**

39. Federal and state regulators have established security standards and issued

---

[12] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html

[13] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

recommendations to prevent data breaches and the resulting harm to consumers. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information.

40. The Federal Trade Commission ("FTC") has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[14]

41. Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[15]

42. The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

43. The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have

[14] *Start With Security*, Fed. Trade Comm'n ("FTC"), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Nov. 17, 2025).

[15] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 17, 2025).

implemented reasonable security measures.[16]

44. The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the FTCA, 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

45. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

46. Defendant's failure to verify that it had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

47. Furthermore, Defendant is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. The Privacy Rule and the Security Rule set nationwide standards for protecting health information, including health information stored electronically.

48. The Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives,

[16] *Id.*

maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.[17]

49. Pursuant to HIPAA's mandate that Defendant follows "applicable standards, implementation specifications, and requirements . . . with respect to electronic protected health information," 45 C.F.R. § 164.302, Defendant was required to, at minimum, "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(e), and "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

50. Defendant is also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

51. Both HIPAA and HITECH obligate Defendant to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive patient Private Information. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. § 17902.

---

[17] *Summary of the HIPAA Security Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (last visited Nov. 17, 2025).

52. Defendant failed to comply with HIPAA and HITECH. It has failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach and loss of data, and failed to ensure the confidentiality and protection of PHI.

**E. Defendant Failed to Comply with Industry Practices.**

53. Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[18] All organizations collecting and handling Private Information, such as Defendant, are strongly encouraged to follow these controls.

54. Additionally, cybersecurity firms have promulgated a series of best practices that at a minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting of physical security systems; protecting against any possible communication system; and training staff regarding critical points.[19]

55. Other best practices include but are not limited to securely configuring business

---

[18] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Nov. 17, 2025).

[19] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, INC. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security (last visited Nov. 17, 2025).

software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, limiting access to sensitive information to only necessary employees, and securing application software.[20]

56. The following frameworks incorporate these data security measures and others and are regularly employed as industry standard practices: the NIST Cybersecurity Framework 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

57. Defendant failed to follow these and other industry standards to adequately protect the Private Information of Plaintiff and Class Members.

**F. The Data Breach Caused Injury to Class Members and Will Result in Additional Harm Such as Fraud.**

58. The ramifications of Defendant's failure to secure Plaintiff and Class Members' data are severe. Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes. The ramifications of Defendant's failure to secure Plaintiff and Class Members' data are severe. Moreover, Defendant's failure to issue any public disclosure about the Data Breach to date, increases the risk of fraud for Plaintiff and

[20] *See* Center for Internet Security, *Critical Security Controls* (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Nov. 17, 2025).

Class Members exponentially.

59. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[21] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[22]

60. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[23] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[24] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[25]

61. When the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar

---

[21] 17 C.F.R. § 248.201 (2013).
[22] *Id.*
[23] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.
[24] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[25] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

to the now-defunct AlphaBay, "are awash with [Private Information] belonging to victims from countries all over the world. One of the key challenges of protecting Private Information online is its pervasiveness. As data breaches in the news continue to show, Private Information about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[26]

62. Identity thieves can use the Private Information that Defendant failed to keep secure to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud, such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

63. Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[27]

64. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a 's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit

---

[26] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, https://www.armor.com/resources/blog/stolen-pii- ramifications- identity-theft-fraud-dark-web/ (last visited Nov. 17, 2025).

[27] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[28] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[29]

65. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[30]

66. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online."[31]

67. Social Security numbers are particularly sensitive pieces of personal

---

[28] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[29] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

[30] Experian, Healthcare Data Breach: What to Know About them and What to Do After One: https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[31] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

information. As the Consumer Federation of America explains:

> *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[32] (Emphasis added).

68. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[33]

69. The Social Security Administration further stresses that:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[34]

---

[32] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.
[33] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[34] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

70. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[35]

71. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to target them with spam emails or solicitations to deceive the victim into providing the criminal with additional personal information.

72. Phishing scammers use emails and text messages to trick people into giving them their personal information, including but not limited to passwords, account numbers, and social security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $18.7 million to such scams in 2023 alone.[36]

73. Accordingly, providing credit monitoring or reimbursing a consumer for a

---

[35] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf.

[36] *Internet Crime Report*, FEDERAL BUREAU OF INVESTIGATION, (2023), https://www.ic3.gov/annualreport/reports/2023_ic3report.pdf scams (last visited November 18, 2025).

financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. Javelin Research reported that "[f]raud-related resolution hours skyrocketed in 2023. The average amount of time consumers spent in 2022 resolving issues stemming from identity fraud clocked in at six hours, but in 2023, fraud resolution hours rose steeply, jumping to a nearly 10-hour average, a major disruption for consumers and financial institutions alike."[37]

74. Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting credit bureaus to place a fraud alert, reviewing their credit reports, placing a credit freeze on their credit, and correcting their credit reports.[38] The result is that Plaintiff and Class Members are forced to spend their own personal time, or take time from work, to respond to the Data Breach.

75. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

76. Because the information stolen in the Data Breach is immutable and cannot be

[37] *Javelin Strategy & Research, 2024 Identity Fraud Study: Resolving the Shattered Identity Crisis* (2024), available at https://javelinstrategy.com/research/2024-identity-fraud-study-resolving-shattered-identity-crisis.

[38] *See* https://www.identitytheft.gov/Steps.

changed, it can be used to perpetrate fraud and identity theft for the remainder of their lives. Plaintiff and Class Members now face years of constant surveillance of their financial and medical records, monitoring, and loss of rights.

**G. Common Injuries & Damages**

77. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

**H. Data Breaches Increase Victims' Risk Of Identity Theft**

78. The unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

79. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of

Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

80. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

81. Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

82. Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[39]

83. Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for

[39] *See* N.C. Gen. Stat. § 132-1.10(1).

identifying and verifying the credit history of prospective customers."[40]

84. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[41] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[42]

85. Because SSNs are used to verify identities for financial accounts, criminals can use an SSN and match it with publicly available data like birth dates and mother's maiden names to fill in the gaps and gain access to accounts either by impersonating the victim over the telephone or answering security questions to gain access to online accounts.

86. One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[43]

---

[40] *See* https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers

[41] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/

[42] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/

[43] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-

87. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

88. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

89. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like insurance information) of Plaintiff and the other Class Members.

90. Thus, even if certain information (such as insurance information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

91. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**I. Loss Of Time To Mitigate Risk Of Identity Theft & Fraud**

92. As a result of the recognized risk of identity theft, when a Data Breach occurs, the reasonable person is expected to take steps and spend time to address the dangerous

---

underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

93. Plaintiff's and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiff and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach.

94. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

95. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[44]

96. Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their

[44] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[45]

97. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

**J. Diminution of Value of Private Information**

98. Private Information is a valuable property right.[46] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

99. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[47]

100. An active and robust legitimate marketplace for Private Information also exists. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[48,49]

---

[45] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

[46] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[47] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[48] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[49] https://datacoup.com/

101. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[50]

102. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

103. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

104. The fraudulent activity resulting from the Data Breach may not come to light for years.

105. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

106. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to thousands of individuals' detailed Private Information and, thus, the significant number of individuals who would be

[50] https://digi.me/what-is-digime/

harmed by the exposure of the unencrypted data.

107. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**K. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary**

108. Given the type of targeted attack in this case, sophisticated criminal activity, and the types of Private Information involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

109. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

110. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

111. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

**L. Loss Of Benefit Of The Bargain**

112. Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant for services, Plaintiff and other reasonable patients understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**M. Plaintiff's Experience**

113. Plaintiff is a current patient of one of Defendant's Clients.

114. To obtain services, Plaintiff was required to provide her Private Information to Defendant, either directly or indirectly, including name, Social Security number, address, medical and other sensitive information.

115. Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff's Private Information.

116. Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

117. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including checking her bills and accounts to make sure they were correct. Plaintiff has spent time dealing with the Data Breach, valuable time she otherwise

would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

118. As a result of the Data Breach, Plaintiff fears for her personal financial security and uncertainty over what medical information was revealed in the Data Breach. She is experiencing anxiety and fear because of the Data Breach and the invasion of her privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

119. Furthermore, Plaintiff's fears are compounded by the fact that her Private Information has already been published on the dark web because of the Data Breach.

120. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

121. As a result of the Data Breach, Plaintiff is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

122. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains Defendant's possession, is protected and safeguarded from future breaches.

123. Plaintiff anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

124. Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of her valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff's Private Information

being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff's Private Information; and (e) continued risk to Plaintiff's Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

## CLASS ALLEGATIONS

125. Plaintiff brings this action on behalf of herself, and all other persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b) (the "Class"):

> All persons residing in the United States whose Private Information was compromised in the Data Breach.

126. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendant has a controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

127. Plaintiff reserves the right to modify or amend the foregoing Class definitions before the Court determines whether certification is appropriate.

128. Numerosity: The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. Upon information and the investigation of counsel, the Class is comprised of thousands of members.

129. Commonality and Predominance: Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff and Class Members' Private Information from unauthorized access and disclosure;

c. Whether Defendant's computer systems and data security practices used to protect Plaintiff and Class Members' Private Information violated the FTC Act, HIPAA, and/or state laws, and/or Defendant's other duties discussed herein;

d. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

e. Whether Defendant unlawfully shared, lost, or disclosed Plaintiff and Class Members' Private Information;

f. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Plaintiff and Class Members suffered injury as a proximate

result of Defendant's negligent actions or failures to act;

i. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff and Class Members' Private Information;

j. Whether Defendant breached duties to protect Plaintiff and Class Members' Private Information;

k. Whether Defendant's actions and inactions alleged herein were negligent;

l. Whether Defendant were unjustly enriched by their conduct as alleged herein;

m. Whether Plaintiff and Class Members were intended third party beneficiaries of contracts between Defendant and its clients, pursuant to which Defendant was required to protect Plaintiff and Class Members' Private Information and privacy, and whether that contract was breached;

n. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

o. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

p. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

130. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of herself, and all other Class Members. Individual

questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

131. Typicality: Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her Private Information compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

132. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Class and has no interests adverse to, or conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

133. Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by a single court.

134. Injunctive and Declaratory Relief: Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

135. All members of the proposed Class are readily ascertainable. Defendant has access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach.

## CAUSES OF ACTION
## COUNT I
## (ON BEHALF OF PLAINTIFF AND THE CLASS)

136. Plaintiff restates and realleges all of the allegations stated above in paragraphs 1-135, as if fully set forth herein.

137. Defendant knowingly collected, possessed, and maintained Plaintiff and Class Members' Private Information, and therefore had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

138. Defendant's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

139. Defendant knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Defendant was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

140. Defendant owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Defendant's duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect the Private Information in its possession it using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA and the FTCA;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

141. Defendant's duty to employ reasonable data security measures arose, in part, under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

142. Defendant's duty also arose because Defendant was bound by industry standards to protect the confidential Private Information entrusted to it.

143. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Defendant owed them a duty of care to not subject them to an unreasonable risk of harm.

144. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff and Class Members' Private Information within Defendant's possession.

145. Defendant, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

146. Defendant, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

147. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Plaintiff and Class Members' Private Information;

e. Failing to comply with the FTCA and HIPAA;

f. Failing to detect in a timely manner that Plaintiff and Class Members' Private Information had been compromised; and

g. Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

148. Defendant acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

149. Defendant had a special relationship with Plaintiff and Class Members. Plaintiff and Class Members' willingness to entrust Defendant with their Private Information was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems (and the Private Information that it stored on them) from attack.

150. Defendant's breach of duties owed to Plaintiff and Class Members caused Plaintiff and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

151. As a result of Defendant's ongoing failure to notify Plaintiff and Class Members regarding the Data Breach, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

152. Defendant's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and loss of time and money to monitor their accounts for fraud.

153. As a result of Defendant's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

154. Defendant also had independent duties under state laws that required it to reasonably safeguard Plaintiff and Class Members' Private Information and promptly notify them about the Data Breach.

155. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

156. The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

157. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

158. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and

monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

159. Plaintiff restates and realleges all of the allegations stated above in paragraphs 1-135, as if fully set forth herein.

160. Pursuant to Section 5 of the FTCA, Defendant had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

161. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiff and Class Members' Private Information.

162. Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

163. Defendant breached its duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff and Class Members' Private Information.

164. Specifically, Defendant breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited

to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

165. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendant's duty in this regard.

166. Defendant also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

167. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendant's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

168. Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and Defendant's failure to comply with both constitutes negligence *per se*.

169. Plaintiff and Class Members' Private Information constitutes personal property that was stolen due to Defendant's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

170. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

171. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

172. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

173. Plaintiff restates and realleges all of the allegations stated above in paragraphs 1-135, as if fully set forth herein.

174. Defendant entered into contracts, written or implied, with its Clients to perform services that include, but are not limited to, providing electronic health record solutions and medical data management services. Upon information and belief, these contracts are virtually identical between and among Defendant and its Clients around the country whose customers and patients, including Plaintiff and Class Members, were affected by the Data Breach.

175. In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

176. These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its Clients. Defendant knew that if it were to breach these contracts with its Clients, its Clients' patients—Plaintiff and Class Members—would be harmed.

177. Defendant breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiff and Class Members thereof.

178. Plaintiff and the Class were harmed by Defendant's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

179. Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

**COUNT IV**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

180. Plaintiff restates and realleges all of the allegations stated above in paragraphs 1-135, as if fully set forth herein.

181. Plaintiff and Class Members conferred a benefit on Defendant by permitting their healthcare providers to turn over their Private Information to Defendant. Moreover, upon information and belief, Plaintiff alleges that payments made by Defendant's Clients to Defendant included payment for cybersecurity protection to protect Plaintiff and Class Members' Private Information, and that those cybersecurity costs were passed on to Plaintiff and Class Members in the form of elevated prices charged by Defendant Clients for their services. Plaintiff and Class Members did not receive such protection.

182. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from payments made to it by its Clients on behalf of Plaintiff and Class Members.

183. As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

184. Defendant has retained the benefits of its unlawful conduct, including the amounts of payment received indirectly from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

185. Defendant knew that Plaintiff and Class Members conferred a benefit upon it, which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff and Class Members' Private Information and prevented the Data Breach.

186. If Plaintiff and Class Members had known that Defendant had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

187. Due to Defendant's conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendant's to be permitted to retain the benefit of its wrongful conduct.

188. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

189. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

190. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

191. Plaintiff restates and realleges all of the allegations stated above in paragraphs 1-135, as if fully set forth herein.

192. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this Complaint.

193. Defendant owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff and Class Members' Private Information.

194. Defendant still possesses Private Information regarding Plaintiff and Class Members.

195. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

196. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

197. Defendant owes a legal duty to secure its Clients' patients' Private Information and to timely notify them of a data breach under the common law, HIPAA, and the FTCA;

a. Defendant's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect patient Private Information; and

b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure its Clients' patients' Private Information.

198. This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with legal and industry standards to protect patients Private Information in its possession, including the following:

a. Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

iv. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

v. conducting regular database scanning and security checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii. meaningfully educating its Clients and their patients and customers about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

199. If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff

will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

200. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

201. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Defendant, thus preventing future injury to Plaintiff, Class Members, and others whose Private Information would be further compromised.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the class, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representatives, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, nominal damages and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself, and the Class, seeks appropriate injunctive

relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard Private Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury of all claims herein so triable.

Dated: November 18, 2025.

Respectfully submitted,

*/s/ Cristina Perez Hesano*

Cristina Perez Hesano (#027023)
**PEREZ LAW GROUP, PLLC**
7508 N. 59th Avenue
Glendale, Arizona 85301
Phone: (602) 730-7100
cperez@perezlawgroup.com

Gary M. Klinger (*pro hac vice* forthcoming)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tele: 866.252.0878
gklinger@milberg.com

Jeff Ostrow (*pro hac vice* forthcoming)
**KOPELOWITZ OSTROW P.A.**
One West Law Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tele: (954) 612-4100
ostrow@kolawyers.com

*Counsel for Plaintiff and the Proposed Class*